## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

Harry Kay,                                :
                                          :
        Plaintiff,                   :
                                          :       Civil Action No. 02-CV-3157
      v.                               :
                                          :
Independence Blue Cross,                  :
                                          :
        Defendant.                   :

### ORDER

      **AND NOW**, this _____ day of _____, 2003, upon consideration of the

Motion for Summary Judgment of Defendant, it is hereby **ORDERED** that Defendant's Motion

is **GRANTED** and judgment is entered in favor of Defendant and against Plaintiff on all Counts

of Plaintiff's Complaint and Plaintiff's Complaint is hereby **DISMISSED WITH PREJUDICE**

in its entirety.


      AND IT IS SO ORDERED.


                                         _____

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

Harry Kay,                         :
                                   :
    Plaintiff,             :
                                   :        Civil Action No. 02-CV-3157
    v.                     :
                                   :
Independence Blue Cross,           :
                                   :
    Defendant.             :


## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant

Independence Blue Cross ("Defendant") hereby moves for summary judgment with respect to all

counts of Plaintiff Harry Kay's Complaint.

In support of this Motion, Defendant relies upon the accompanying memorandum

of law and the attached exhibits.  Defendant respectfully requests oral argument on this Motion.

Respectfully submitted,

Steven R. Wall (#39012)
Amanda D. Haverstick (#85069)
Pam R. Jenoff (#87821)
1701 Market St.
Philadelphia, PA 19103
215.963.4928/5377/5546


Attorneys for Defendant
Independence Blue Cross

Dated:  April 1, 2003

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

Harry Kay,                              :
                                        :
        Plaintiff,              :
                                        :
           v.                 :    Civil Action No. 02-CV-3157
                                        :
Independence Blue Cross,                :
                                        :
        Defendant.              :


## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Independence Blue Cross ("Defendant") hereby moves for summary judgment with respect to all counts of Plaintiff Harry Kay's Complaint.

In support of this Motion, Defendant relies upon the accompanying memorandum of law and the attached exhibits. Defendant respectfully requests oral argument on this Motion.

Respectfully submitted,

Steven R. Wall (#39012)
Amanda D. Haverstick (#85069)
Pam R. Jenoff (#87821)
1701 Market St.
Philadelphia, PA 19103
215.963.4928/5377/5546


Attorneys for Defendant
Independence Blue Cross

Dated: April 1, 2003

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

Harry Kay,                                 :
                                           :
        Plaintiff,                        :
                                           :          Civil Action No. 02-CV-3157
      v.                               :
                                           :
Independence Blue Cross,                   :
                                           :
        Defendant.                        :

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Steven R. Wall (#39012)
Amanda D. Haverstick (#85069)
Pam R. Jenoff (#87821)
1701 Market St.
Philadelphia, PA 19103
215.963.4928/5377/5546

Attorneys for Defendant
Independence Blue Cross

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ..................................................................................... 2

ARGUMENT .......................................................................................................... 9

I.      STANDARD FOR SUMMARY JUDGMENT................................................ 9

II.     PLAINTIFF CANNOT SUSTAIN A TITLE VII CLAIM............................ 10

      A.     Plaintiff Cannot Establish Harassment *Because of* Gender. ............... 11

           1.    Title VII Does Not Provide Relief for Sexual Orientation
                Discrimination................................................................... 11

           2.    Plaintiff's Attempt To Recast His Claim as One For Gender
                Stereotyping Must Be Rejected. ....................................... 13

      B.     Plaintiff Was Not Subjected To Severe and Pervasive Harassment. .... 17

           1.    Standard for Actionable Harassment. ................................ 17

           2.    The Conduct Plaintiff Alleges Was Not Severe. ................ 18

           3.    The Conduct Plaintiff Alleges Was Not Pervasive................ 19

      C.     Plaintiff Cannot Establish Respondeat Superior Liability. ................... 20

III.    PLAINTIFF CANNOT SUSTAIN A CLAIM FOR INTENTIONAL
      INFLICTION OF EMOTIONAL DISTRESS................................................. 23

      A.     The PWCA Bars Plaintiff's Intentional Infliction of Emotional Distress
           Claim.................................................................................... 23

      B.     The Conduct Plaintiff Alleges Does Not Give Rise To A Claim for
           Intentional Infliction of Emotional Distress. ........................ 24

      CONCLUSION.................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

Allen v. Nat'l R.R. Passenger Corp.,
90 F. Supp. 2d 603 (E.D. Pa. 2000), aff'd, 254 F.3d 1077 (3d Cir. 2001) ..................................20

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)..................................................................................................................9

Andrews v. City of Philadelphia,
895 F.2d 1469 (3d Cir. 1990)...................................................................................................24

Baskerville v. Culligan Int'l Co.,
50 F.3d 428 (7th Cir. 1995) .....................................................................................................17

Bibby v. Coca Cola Bottling Co.,
260 F.3d 257 (3d Cir. 2001)....................................................................................................11

Bianchi v. City of Philadelphia,
183 F. Supp. 2d 726 (E.D. Pa. 2002) .......................................................................................16

Bishop v. Nat'l R.R. Passenger Corp.,
66 F. Supp. 2d 650 (E.D. Pa. 1999) .........................................................................................19

Bonora v. UGI Utilities,
No. Civ. A. 99-5539, 2000 WL 1539077 (E.D. Pa. Oct. 18, 2000)...........................................20

Celotex Corp. v. Catrett,
477 U.S. 317 (1986).................................................................................................................9

Cooper-Nicholas v. City of Chester,
No. Civ. A. 95-6493, 1997 WL 799443 (E.D. Pa. Dec. 30, 1997)...........................................20

Cox v. Keystone Carbon Co.,
861 F.2d 390, (3d Cir. 1988) cert. denied, 498 U.S. 811 (1990) ...............................................24

DiBartolo v. City of Philadelphia,
No. Civ. A. 99-CV-1734, 2000 WL 217746 (E.D. Pa. Feb. 15, 2000)...................................11, 12

Faragher v. City of Boca Raton,
524 U.S. 775 (1998)................................................................................................................17

Gautney v. Amerigas Propane, Inc.,
107 F. Supp. 2d 634 (E.D. Pa. 2000) .......................................................................................18

i

Groman v. Township of Manalapan,
47 F.3d 628 (3d Cir. 1995)...................................................................................9

Harris v. Forklift Sys., Inc.,
510 U.S. 17 (1993).....................................................................................17, 19

Heywood v. Cruzan Motors, Inc.,
792 F.2d 367 (3d Cir. 1986)..............................................................................24

Higgins v. New Balance Athletic Shoes, Inc.,
194 F.3d 252 (1st Cir. 1999).............................................................................11

Hoy v. Angelone,
720 A.2d 745 (Pa. 1998)...................................................................................24

Hirras v. Nat'l R.R. Passenger Corp.,
95 F.3d 396 (5th Cir. 1996)...............................................................................22

Ianetta v. Putnam Investments, Inc.,
183 F. Supp. 2d 415 (D. Mass. 2002) ...............................................................16

Keown v. Richfood Holdings,
No. Civ. A. 01-2156, 2002 WL 1340311, at 3 (E.D. Pa. June 19, 2002) .........10, 18, 20

Kotlinski v. Mortgage America, Inc.,
40 F. Supp. 2d 298 (W.D. Pa. 1998)..................................................................25

Kunin v. Sears Roebuck & Co.,
175 F.3d 289, cert. denied, 528 U.S. 964 (1999) .............................................10, 19, 20

Martin v. New York State Dep't of Correctional Servs.,
224 F. Supp. 2d 434 (N.D.N.Y. 2002)................................................................16

Matczak v. Frankford Candy and Chocolate Co.,
136 F.3d 933 (3d Cir. 1997)..............................................................................23

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986)............................................................................................9

McDonnell v. Cisneros,
94 C 7314, 1995 WL 110131, (N.D. Ill. Mar. 13, 1995) aff'd in part and rev'd in part on other grounds, 84 F.3d 256 ......................................................22

Mensah v. Resources for Human Development,
No. 97-2517, 1997 WL 792901 (E.D. Pa. Dec. 23 1997)..................................25

Ness v. Marshall,
660 F.2d 517 (3d Cir. 1981)...........................................................................9

Oncale v. Sundowner Offshore Services, Inc.,
523 U.S. 75 (1998).............................................................................11, 17

Poyser v. Newman & Co.,
522 A.2d 548 (Pa. Super.1987).................................................................23

Price Waterhouse v. Hopkins,
490 U.S. 228 (1989).................................................................................13

Reimer v. Tien,
514 A.2d 566 (Pa. Super. 1986)................................................................24

Santiago v. Pennsylvania Nat'l Mut. Casualty Ins Co.,
613 A.2d 1235 (Pa. Super. 1992)...............................................................24

Shaffer v. Proctor & Gamble,
604 A.2d 289 (Pa. Super. 1989) appeal denied, 616 A.2d 986 ................23, 24

Shick v. Shirey,
716 A.2d 1231 (Pa. 1998) .........................................................................23

Siko v. Kassab, Archbold & O'Brien,
No. Civ. A. 98-402, 2000 WL 307247, (E.D. Pa. Mar. 24, 2000) ................10

Simonton v. Runyon,
232 F.3d 33 (2d Cir. 2000)........................................................................12

Snyder v. Specialty Glass Prod., Inc.,
658 A.2d 366 (Pa. Super. 1995).................................................................23

Spearman v. Ford Motor Co.,
231 F.3d 1080, (7th Cir. 2000) cert. denied, 532 U.S. 995 (2000) ..........15, 16

Steffeninin v. G.G.D., Jr., Inc.,
No. 94-5333, 1995 WL 230259 (E.D. Pa. Apr. 17, 1995).............................24

Trigg v. New York City Transit Auth.,
No. 99-CV-4730, 2001 WL 868336 (E.D.N.Y. July 26, 2001)....................14

Weston v. Commonwealth of Pennsylvania,
No. Civ. A. 98-3899, 2001 WL 1491132, at 3 (E.D. Pa. Nov. 20, 2001).......17

**STATUTES**

42 U.S.C. § 2000e-2 ...................................................................................................................11

**RULES**

Fed. R. Civ. P. 56 .......................................................................................................................9

# INTRODUCTION

This case is an improper attempt by a homosexual male employee to come within Title VII's protection by recasting his alleged experiences with anti-gay teasing and name-calling at work as a claim for unlawful "gender stereotyping." For all of the reasons discussed below, this Court should reject such a blatant attempt to avoid the limitations of Title VII, and grant summary judgment in favor of Independence Blue Cross ("IBC" or "Company").

Plaintiff, Harry Kay, a former Product Analyst at IBC, first litigated this matter as a sexual orientation harassment claim under the Philadelphia Fair Practices Ordinance, which prohibits discrimination based on sexual orientation. Having lost that claim in that forum, Plaintiff has now restyled his complaint in this forum as one for "gender stereotyping" under Title VII of the Civil Rights Act of 1964 ("Title VII"), which does *not* prohibit sexual orientation discrimination. This attempt is both frivolous and disingenuous, and this Court should reject it. There is simply nothing in the record to distinguish Plaintiff's experiences at IBC from the myriad of other cases where courts have routinely rejected homosexual males' attempts to secure Title VII protection.

Even assuming, *arguendo*, that the Court finds that Plaintiff has produced evidence that he was targeted for harassment because of his gender, rather than his sexual orientation, Plaintiff still cannot sustain a Title VII claim because he cannot show that he was subjected to severe and pervasive harassment, or that IBC is legally responsible. The co-worker misconduct Plaintiff alleges amounts to nothing more than a handful of minor and isolated incidents spanning over a 2 ½ year period. Plaintiff also admittedly never complained about many of the incidents he now alleges, and, when he did complain, IBC took prompt remedial action in response. These facts preclude Plaintiff from imputing respondeat superior liability on IBC.

1

## STATEMENT OF FACTS

### IBC's Sexual Harassment Policy

IBC maintains a strict policy against sexual harassment that is distributed to all employees. (Grossi-Tyson Decl., at ¶ 2; see Exh. A.)[1] The policy provides that:

> It is the policy of the Company to prohibit any and all forms of harassment in the workplace. . . . Examples of harassment include, but are not limited to, "kidding," "teasing" or "joking," which could be deemed by a reasonable person to be derogatory comments based on gender, age, race, religion, national origin, disability or sexual orientation or the display of objects and pictures of an inappropriate nature.

(Exh. A.) The policy directs that, "[a]ll Employees have an **absolute obligation** to report any violation of the Policy," and that violations may be reported to an employee's supervisor, a Human Resources Department manager, an attorney in the Company's Legal Department, the Compliance Officer, the Corporate Secretary, or the Audit Officer. (Id.) (Emphasis in original.) Plaintiff admittedly received IBC's harassment policy in connection with the commencement of his employment. (Kay Depo., at 386-87.)

### Plaintiff's Employment at IBC

Plaintiff commenced employment at IBC in June 1992 as an analyst in the Internal Systems Coordination ("ISC") Department. (Id., at 23.) In August 1997, Plaintiff became a Product Analyst in the Company's Product Analysis and Compliance Unit on the 42nd floor. (Id., at 23, 25-26.) Initially, Plaintiff reported to supervisor Beverly McFadden, who

---

[1]    References to the Declarations of Laura Grossi-Tyson, Esq., Anthony Boswell, Esq., and Sara Staples are cited as "Grossi-Tyson Decl.," "Boswell Decl.," and "Staples Decl.," respectively, and are attached as Exhibits 1, 2, and 3 to the accompanying Appendix. References to the deposition transcripts of Harry Kay, Guy Gilpin, Dennis Foley, Donna Bennett, and Ronald Gilg are cited as "Kay Depo.," "Gilpin Depo.," "Foley Depo.," "Bennett Depo.," and "Gilg Depo.," respectively, and are attached as Exhibits 4-8 to the accompanying Appendix.

2

reported to manager Sandi Kimmel, who reported to the Senior Director of Underwriting, Guy Gilpin.  (Id., at 26.)  In or about September 1998, Lila Tyson replaced Kimmel as Plaintiff's manager.  (Id.)

On August 13, 1999, Plaintiff commenced short term disability leave from IBC in connection with emotional problems.  (Kay Depo., at 315.)  Plaintiff had a family history of depression, for which he had been treated with medication since the 1980's.  (Id., at 230-31.) Upon Plaintiff's return from leave on November 29, 1999, he was provided with a counselor at no charge pursuant to IBC policy and was permitted to take time out of his work day to attend counseling sessions.  (Id., at 315-19.)  On February 17, 2000, Plaintiff took a second leave from IBC in connection with emotional problems, and he never again returned to work.  (Grossi-Tyson Decl., at ¶ 7.)[2/]

**Alleged Harassment Experienced by Plaintiff**

Plaintiff alleges that over the course of his 2 ½ year tenure in IBC's Product Analysis and Compliance Unit, he experienced the following instances of co-worker harassment:

- In August 1997, Plaintiff allegedly overheard two males in the restroom say, "[D]id you see that fag that moved up on the floor yesterday?", and he saw a petition on the wall that stated, "If you want this queer off the floor, sign here."  (Kay Depo., at 52, 56.)

- Seven months later, in or about March 1998, Plaintiff allegedly received:

  (i)     a document stating "stop staring at me in the bathroom and on the floor, you faggot," (Id., at 59; Exh. B);

---

[2/]     Between August 13 and November 29, 1999, and between February 17, 2000 and August 8, 2002, Plaintiff received disability benefits from IBC.  (Grossi-Tyson Decl., at ¶¶ 6, 7.)  Because Plaintiff's illness was predicated on mental, rather than physical, impairment, he was entitled to a maximum of 24 months of long-term disability ("LTD") benefits.  (Id., at ¶ 8.)  On October 18, 2002, pursuant to standard IBC policy, Plaintiff's employment was terminated when he was medically unable to return to work after exhaustion of his LTD benefits.  (Id.)

    (ii)    a letter accusing him of taking mail from Kimmel's in-box, (id., at 66-73; Exh. C); and

    (iii)    a letter addressed to Kimmel stating, *inter alia*, "I do wish you would ask Harry to stop staring, glaring and mumbling comments at the men who pass his desk," (id., at 66-73; Exh. D).

- Two months later, in May 1998, Plaintiff allegedly received a voicemail at work from an outside caller that contained heavy breathing. (Kay Depo., at 90, 101, 103.) Plaintiff also allegedly received additional, "sporadic" voicemails from outside callers that contained words to the effect of "faggot," "fem," and "ass wipe." (Id., at 105-06.) Plaintiff could not say how many voicemails he received or when he received them, but they always occurred prior to the start of the workday. (Id., at 105-06, 117.)

- Two months later, in July 1998, Plaintiff allegedly received through the outside mail an advertisement for a homosexual telephone chat line that read "GAY! GAY! GAY!" and contained the phone number "1-800-FREE-GAY." (Id., at 78, 86; Exh. E.) Written above the advertisement were the words, "A real man in the corporate world would not come to work with an earring in his ear. But I guess you will never be a 'real man.'!!! And that haircut, you look like an old yoda." (Exh. E.)

- Five months later, in December 1998, Plaintiff allegedly witnessed Dennis Foley (an employee from a different floor) walk behind him and a colleague, John Butts, making a bent wrist and pointing at them. (Kay Depo., at 137-141.)

- Eight months later, in August 1999, a secretary from Plaintiff's floor, Donna Bennett, allegedly "star[ed] at [Plaintiff] with her hand on her hip . . . [and] shook her head" when Plaintiff failed to change a bottle on the office water cooler. (Id., at 151.) Bennett allegedly had another employee change the water and then "yelled out, 'I'm glad that there's a real man on the floor.'" (Id.) Bennett then said to Plaintiff, "You are just so gay." (Id., at 151-52.) Approximately one week later, Bennett was allegedly "loud and boisterous" around the water cooler, joking with words to the effect of "look how many people it takes to change a water cooler." (Id., at 154, 158.)

- Six months later, in February 2000, Plaintiff allegedly received another voicemail that contained heavy breathing and undecipherable voices. (Id., at 121.)[3]

---

[3]    Plaintiff also claims that the day before he left the ISC Department in August 1997, McBride-Schmel commented on the fact that he was not married, (see Kay Depo., at 178), but he admits that she "just said it for gossip" and was not harassing him. (Id., at 182-83; see also id., at 24-25 (admitting that he was not harassed until after he moved departments in August 1997). Plaintiff never reported this incident to IBC management or Human Resources. (Id., at 184.)

Plaintiff suspected that two co-workers from his floor, Jim Jones and Scott Dickler, were responsible for the mens' room incidents in August 1997, but he has "no idea" who was responsible for the mail or voicemails. (Kay Depo., at 52-53, 62, 74-75, 83, 103, 119-20.) Plaintiff also admits that he has no reason to believe that Jones or Dickler had spoken with Foley or Bennett about him. (Id., at 56.)

**Plaintiff's Reports of Harassment and IBC's**
**Investigation and Remedial Measures in Response**

Plaintiff admittedly did not report many of the above incidents to IBC management or Human Resources ("HR"). For example, Plaintiff never reported the incident where Bennett allegedly joked, "look how many people it takes to change a water cooler"; he did not report the alleged mens' room incidents until seven months after they occurred; and he only reported receiving "three or four" voicemails. (Kay Depo., at 54, 56, 107, 112, 160-61.)

With respect to the incidents that Plaintiff did report, IBC took the following investigative and remedial measures:

*Alleged "Hate Mail"*

When Plaintiff complained of receiving "hate mail," and belatedly reported the alleged mens' room activity, in March 1998, then in-house counsel Anthony Boswell and HR Director Ronald Gilg conducted an investigation into his complaint, including interviewing Plaintiff, examining the "hate mail" to try to determine its source, and interviewing various employees on Plaintiff's floor. (Boswell Decl., at ¶¶ 2, 3; see Kay Depo., at 52, 62, 66; Gilg Depo., at 72.) According to Plaintiff, Gilg told him that he hoped the sender of the mail would come forward so that he could give him or her "a piece of his mind." (Kay Depo., at 73.) Gilg also alerted Plaintiff's managers about the situation. (Gilg Depo., at 73; Gilpin Depo., at 25.)

Based on their investigation, Gilg and Boswell were unable to determine the

source of the mail. (Boswell Decl., at ¶ 4; Gilg Depo., at 72.) They therefore arranged for all employees on Plaintiff's floor to attend Civil Treatment Training, which included training in IBC's policy against sexual harassment. (Boswell Decl., at ¶ 5; Gilg Depo., at 86-88; see Kay Depo., at 88.)

When Plaintiff later complained in August 1999 that he did not believe IBC had done enough to stem the harassment he was allegedly enduring, Gilg arranged for a meeting among himself, Plaintiff and in-house counsel Laura Grossi-Tyson. (See Kay Depo., at 376; Gilg Depo., at 56-61.) Plaintiff testified that he believed Grossi-Tyson was "receptive" to his complaints during this meeting. (Kay Depo., at 376.) Grossi-Tyson offered to have an outside professional handwriting analysis done on the mail Plaintiff had allegedly received to try to determine its source, and she in fact did so. (Grossi-Tyson Decl., at ¶ 3; see Kay Depo., at 374.) The results of this professional analysis, however, were inconclusive. (Grossi-Tyson Decl., at ¶ 3.)

### *Alleged Voicemails*

With respect to the 3-4 voicemails Plaintiff reported receiving over the course of his 2 ½ year tenure on the 42nd floor, Gilg had a trace placed on Plaintiff's phone on at least three occasions. (Kay Depo., at 107-08, 112, 118-19.) The traces were unable to determine the source of the voicemails, however, because, according to Plaintiff, the voicemails always "[came] in right after the trace expired." (Id., at 107.)

Plaintiff testified that at first, he was satisfied with Gilg's response to his complaints about the voicemails, because "[w]hat else could he do?" (Kay Depo., at 96.)[4] Ultimately, however, Plaintiff believed that IBC should have placed a permanent tap on his

---

4/    Plaintiff also testified that he had reported some of the voicemails to McFadden, but had advised her that he did not want her to take any action, because the problem was "in the hands of personnel." (Kay Depo., at 91-92, 97.)

6

phone. (Id., at 115.)  According to Gilg and Grossi-Tyson, however, IBC had attempted to place a permanent tap on Plaintiff's phone, but such a tap was impossible from a technological standpoint.  (Gilg Depo., at 106; Grossi-Tyson Decl., at ¶ 4.)

Grossi-Tyson and Gilg also conducted further investigation by interviewing approximately nine additional employees who worked on the 42nd floor.  (Grossi-Tyson Decl., at ¶ 5.)  Based on these interviews, there was no evidence that the alleged voicemails had come from an IBC employee.  (Id.)

### Incident Involving Dennis Foley

With respect to Plaintiff's complaint about Foley walking behind him and John Butts with a bent wrist, Gilg spoke with Isadore Baseman (Foley's supervisor), Butts and Foley. (Kay Depo., at 142-43; Gilg Depo., at 110.)  Gilg counseled Foley orally about the incident, which caused Foley to be concerned about the security of his job and to seek the advice of an attorney.  (Foley Depo., at 26, 39; Gilg Depo., at 111-20; see Kay Depo., at 143.)

Following Gilg's discussion with Foley, Plaintiff never experienced any further "harassment" by Foley.  (Kay Depo., at 143.)

### Incident Involving Donna Bennett

In response to Plaintiff's complaint about Donna Bennett saying "you're so gay" to him in connection with his failure to change a water cooler bottle, Gilg spoke with both Bennett and her supervisor, John Brna.  (Kay Depo., at 153-54; Bennett Depo., at 97; Gilg Depo., at 131.)  Bennett admitted to making the "you're so gay" statement.  (Bennett Depo., at 97; Gilg Depo., at 130.)  Gilg gave Bennett a verbal warning, and Brna counseled Bennett that her behavior was inappropriate.  (Bennett Depo., at 99-108; Gilg Depo., at 130-31.)

Following this remedial action, Plaintiff never reported any further "harassment"

7

by Bennett. (Kay Depo., at 154, 160-61.)

**Plaintiff's Litigation Against IBC**

In February 2000, Plaintiff filed a complaint against IBC with the Philadelphia Commission on Human Relations ("PCHR") and the Pennsylvania Human Relations Commission ("PHRC"). (See Exh. F.) In that complaint, Plaintiff claimed four times that he had been harassed at IBC because of his "sexual orientation." (Id., at ¶¶ 3(a), 3(a)(2), 3(a)(3)(a) & 6.) Plaintiff admitted at his deposition, moreover, that this claim was accurate. (Kay Depo., at 167-68.) Plaintiff also signed his complaint under penalty of perjury, certifying that the statements contained therein were true. (Id.)[5/] Plaintiff never once in that complaint made reference to the "gender stereotyping" theory. (See Exh. F.)

The PCHR took the lead in investigating Plaintiff's complaint, as it had jurisdiction over all of Plaintiff's allegations, including harassment based upon sexual orientation. The PCHR dismissed Plaintiff's complaint on July 26, 2001 as "not substantiated."

Having lost before the PCHR, Plaintiff then filed the instant Complaint on May 22, 2002, improperly recasting his sexual orientation claim as one for gender stereotyping under Title VII. As discussed in detail below, Plaintiff has insufficient evidence to support such claim, and the Court should grant summary judgment for IBC.

---

[5/]    Plaintiff attempted to back away from his administrative complaint during his deposition by saying that he had *not* been harassed based on sexual orientation, that it was likely he had signed his complaint under penalty of perjury without reading it, and that his attorney "may have filed it the wrong way." (Id., at 172.)

# ARGUMENT

## I.    STANDARD FOR SUMMARY JUDGMENT

Fed. R. Civ. P. 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see Fed. R. Civ. P. 56(c). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex, 477 U.S. at 327 (citation omitted).

To survive summary judgment, Plaintiff "must go beyond the initial pleadings" and "designate specific facts showing that there is a genuine issue for trial." Id., 477 U.S. at 322; see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-52 (1986); Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). "[B]are assertion[s], conclusory allegations, or suspicions" as to material facts are insufficient. Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981).

To prevail on its Summary Judgment Motion, moreover, Defendant is not required to produce evidence to negate Plaintiff's claims; rather, it only must point to the absence of evidence to support those claims. Celotex, 477 U.S. at 322. A dispute over non-material facts will not defeat summary judgment, as Plaintiff's failure to produce sufficient evidence to support an essential element of his claim "necessarily renders all other facts immaterial." Id.; see Groman, 47 F.3d at 633 (same). "Where the record taken as a whole could not lead a rational trier of fact to find for the [plaintiff]," summary judgment is appropriate. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

9

Under these standards, the undisputed record shows that Plaintiff has insufficient evidence to raise a triable issue on any of his claims, and the Court should grant summary judgment for IBC.

## II.    PLAINTIFF CANNOT SUSTAIN A TITLE VII CLAIM.

To state a claim for co-worker sexual harassment under Title VII,[6] Plaintiff must establish (1) that he suffered from intentional discrimination because of his gender; (2) that the discrimination was pervasive and regular; (3) that the discrimination detrimentally affected him; (4) that the discrimination would have detrimentally affected a reasonable person of the same sex in that position; and (5) respondent superior liability. Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999), cert. denied, 528 U.S. 964 (1999); Keown v. Richfood Holdings, No. Civ. A. 01-2156, 2002 WL 1340311, at *3 (E.D. Pa. June 19, 2002) (Schiller, J.).

Plaintiff fails as a matter of law to meet these requirements. Plaintiff cannot show that he was harassed *because of* his gender; he cannot show that any harassment he endured was

---

[6]    Plaintiff does not allege that he was subjected to *quid pro quo* harassment. Moreover, although Plaintiff alleges unfair supervisory criticism of his performance, (see Compl., at ¶ 18), he does not allege that any supervisor engaged in sexually harassing behavior toward him. (See Kay Depo., at 27.) Supervisory criticism of an employee's performance does not constitute an "adverse employment action" that can give rise to Title VII liability. See Siko v. Kassab, Archbold & O'Brien, No. Civ. A. 98-402, 2000 WL 307247, at *5 (E.D. Pa. Mar. 24, 2000) (holding that negative performance evaluations did not qualify as an adverse employment action because "an adverse employment decision is one in which a discharge, refusal to rehire, or other action occurs that alters the employee's compensation, terms, conditions or privileges of employment, or deprives him or her of employment opportunities, or adversely affects his or her status as an employee") (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)). Nor can Plaintiff state a claim for discriminatory failure to promote, in connection with his July 1999 posting for an Assistant Product Manager position, (see Compl., ¶ 19), because he admitted that he was not qualified for the position when he told the interviewer that he was unwilling to run cross-functional group meetings or give oral presentations and training seminars to sales force employees, as the position required. (See Kay Depo., at 358.)

severe and pervasive; and he cannot establish respondeat superior liability.[7/]  These failures

mandate summary judgment for IBC.

**A.**    <u>**Plaintiff Cannot Establish Harassment *Because of* Gender.**</u>

To state a Title VII claim, an employee must show discrimination based on a

characteristic protected by Title VII.  <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75,

81 (1998); <u>see</u> 42 U.S.C. § 2000e-2.  Here, because Plaintiff's complaint has been and continues

to be nothing more than a claim for harassment based on sexual orientation, which is not

protected by Title VII, his claim fails as a matter of law and should be dismissed.

**1.**    <u>**Title VII Does Not Provide Relief for Sexual Orientation Discrimination.**</u>

It is well-settled that Title VII's prohibition against sexual harassment does not

protect employees from harassment based on sexual orientation.  <u>Bibby v. Coca Cola Bottling</u>

<u>Co.</u>, 260 F.3d 257, 261 (3d Cir. 2001) ("It is clear . . . that Title VII does not prohibit

discrimination based on sexual orientation."); <u>DiBartolo v. City of Philadelphia</u>, No. Civ. A. 99-

CV-1734, 2000 WL 217746, at *9 (E.D. Pa. Feb. 15, 2000) ("The appeals courts that have

considered whether Title VII prohibits conduct based on an employee's sexual orientation agree

that it does not."); <u>Higgins v. New Balance Athletic Shoes, Inc.</u>, 194 F.3d 252, 259 (1st Cir.

1999) ("[W]e regard it as settled law, that as drafted and authoritatively construed, Title VII does

not proscribe harassment simply because of sexual orientation.").

In this case, Plaintiff's own claims make abundantly clear that the harassment he

alleges to have endured was based on his sexual orientation.  Plaintiff complains that coworkers

said, "Did you see *that fag* that moved up on the floor yesterday"; placed a petition on the mens'

---

[7/]    IBC does not contest, for purposes of this Summary Judgment Motion, that Plaintiff was
detrimentally affected by the harassment he alleges to have endured.

room wall that stated "If you want *this queer* off the floor, sign here"; walked behind him and a colleague with a limp wrist; left him voicemails that included the words "faggot," "fem," and "ass wipe"; called him "just so *gay*"; and sent him "hate mail" that included the words, "stop staring at me in the bathroom and on the floor, *you faggot*," "stop staring, glaring, and mumbling comments at *the men* who pass [your] desk," and "*GAY! GAY! GAY!*" (in a *homosexual* male hotline). (Kay Depo., at 52, 56, 59, 66-73, 78, 86, 137-141, 151-52.) (Emphasis added.)  With respect to the limp wrist incident, when asked why he thought the co-worker acted in that manner, Plaintiff responded "well, maybe it was because he knows that [my colleague] is gay. And anyone that hangs out with the gay men must be gay." (Id., at 146.)

    In addition, Plaintiff has admitted on several occasions that he was the target of sexual orientation harassment.  Indeed, in Plaintiff's administrative complaint, he stated four times that he was harassed at IBC because of sexual orientation.  (See Exh. F, at ¶¶ 3(a), 3(a)(2), 3(a)(3)(a) & 6.)  Plaintiff admitted the accuracy of such claim at his deposition.  (Kay Depo., at 165-66.)  Plaintiff also told the representative responsible for ensuring his LTD benefits that he was harassed as a result of his sexual orientation.  (Staples Decl., at ¶ 2.)

    Thus, based on both the nature of Plaintiff's harassment complaints and his numerous admissions that he was harassed because of his sexual orientation, there can be no doubt that Plaintiff's claim is essentially one for sexual orientation discrimination that is not covered by Title VII.  See Bibby, 260 F.3d at 261 (granting summary judgment for employer on employee's claim of sexual orientation harassment because it was not covered by Title VII); DiBartolo, 2000 WL 217746, at *9 (dismissing sexual orientation discrimination complaint as a matter of law); Simonton v. Runyon, 232 F.3d 33, 36 (2d Cir. 2000) (rejecting plaintiff's claim that Title VII's prohibition of gender discrimination included sexual orientation discrimination).

The Court should therefore grant summary judgment for IBC.

2. **Plaintiff's Attempt To Recast His Claim As
One For Gender Stereotyping Must Be Rejected.**

Plaintiff's attempt to recast his sexual orientation claim as one for gender stereotyping does not save his case. The harassment that Plaintiff alleges simply does not fit with the gender stereotyping theory.

Plaintiff's stereotyping claim is grounded in the Supreme Court's <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989), decision, which permitted a female employee to recover for Title VII gender discrimination on the theory that she had been denied partnership in an accounting firm because she was insufficiently feminine. The plaintiff in that case had evidence that one firm partner advised her she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry," to improve her chances at partnership; another partner described her as too "macho"; a third suggested that she "overcompensated for being a woman"; a fourth advised her to take a course at charm school; and others took issue with her use of profanity "because it's a lady using foul language." <u>Id.</u>, at 235. The Court held that the plaintiff had presented sufficient evidence that she had been denied partnership because she failed to conform to female stereotypes, and she therefore could sustain a Title VII gender discrimination claim. <u>Id.</u>, at 254-55.

The facts of this case are not at all analogous to those of <u>Price Waterhouse</u>. Here, the alleged harassment consists, *inter alia*, of Plaintiff being called "faggot," "fag," "gay," "ass wipe" and "queer," being accused of leering at other men, and receiving an advertisement for a gay men's chat line. This "harassment" is indisputably grounded in Plaintiff's sexual orientation. The only two incidents alleged by Plaintiff that even make reference to his gender -- the "hate mail" words, "a real man in the corporate world would not come to work with an

13

earring in this ear," and Bennett's alleged comment that she was "glad that there's a real man on the floor" to change the water cooler, (Kay Depo., at 78, 86, 151-52; Exh. E) -- were both linked with explicit commentary on Plaintiff's homosexuality. Included directly below the "real man" statement was an advertisement for a homosexual hotline that read "GAY! GAY! GAY!", Exh. E), and Bennett's statement was made in connection with her telling Plaintiff "you are just so gay." (Kay Depo., at 151-52.)[8]

Moreover, Plaintiff admits that he did not believe that he had been harassed because of gender stereotyping until *after* the limp wrist incident with Foley and the water cooler incident with Bennett. (See Kay Depo., at 55-56.) Plaintiff claims that these latter incidents caused him to believe that prior harassment was based on gender stereotyping rather than sexual orientation. (Id.) Plaintiff admits, however, that he has no reason to believe that Foley or Bennett had spoken with Jones or Dickler (the individuals he suspected of the 1997 men's room comments), and he had "no idea" who sent him the mail or voicemails or why they did so. (See Kay Depo., at 52-53, 55-56, 62, 74-75, 83, 103, 119-20.) Thus, he cannot possibly establish any group perception of his lack of masculinity or any concerted effort to harass him based on gender stereotyping. These facts make this case no different from the large body of caselaw that has rejected homosexual males' attempts to come under Title VII's purview.

In Trigg v. New York City Transit Authority, No. 99-CV-4730, 2001 WL 868336, at *3, *6 (E.D.N.Y. July 26, 2001), for example, the court rejected a homosexual male's gender stereotyping claim where his supervisor had told him that he needed to carry a heavy bag of coins in a "more manly" way and that his performance was comparable to that of a woman.

---

[8] Nor do these two isolated incidents, standing alone, come anywhere near the severe and pervasive threshold required to state a Title VII claim. (See infra, Section II, B.)

14

The supervisor had also, on other occasions, called Plaintiff "faggot," "faggot ass," and "sissy." Id., at *6. The court held that "sexual orientation and not gender stereotyping was the *sine qua non* of [the plaintiff's] grievance," and it was therefore not actionable under Title VII. Id. The court reasoned that even if the supervisor's "comments about the way [Plaintiff] was working in comparison to women and about being more manly could be construed as gender stereotypical, they [were] the 'sporadic use of abusive language, gender-related jokes and occasional teasing,' which, when properly applied, Title VII filters out as they are too isolated to amount to a change in the terms and conditions of employment." Id. (citation and quotation omitted).

The court likewise rejected a gender stereotyping claim in Spearman v. Ford Motor Company, 231 F.3d 1080, 1082-85 (7th Cir. 2000), cert. denied, 532 U.S. 995 (2000), where a homosexual male alleged that co-workers had called him "bitch," "gay ass," "pussy-ass," "fag," and "gay" on several occasions and had written graffiti on the wall that associated him with a "drag queen." The plaintiff claimed that this harassment was based on his co-workers' belief that he was too feminine to fit the male image at Ford, because the term "bitch" referred to a female, the "drag queen" graffiti portrayed him as female, and one of Ford's supervisors had testified that there was a "masculine environment at the Ford plant." Id., at 1085. The plaintiff also claimed that he had been assigned to housekeeping and window washing duties, which were functions "traditionally reserved for women" at Ford. Id. The court rejected plaintiff's Title VII claim, reasoning that it "must consider any sexually explicit language or stereotypical statements *within the context of all of the evidence of harassment in the case.*" Id. (emphasis added.) The court concluded that based on all of the evidence, including the references to plaintiff as "bitch," "fag," and "gay," it was clear that plaintiff's co-workers were harassing him because of his homosexuality, not because he was a man. Id. Accordingly,

the plaintiff could not sustain a Title VII gender discrimination claim.  Id.

      Similarly, in <u>Bianchi v. City of Philadelphia</u>, 183 F. Supp. 2d 726, 731-32 (E.D.

Pa. 2002) (Brody, J.), the court rejected a Title VII claim by a homosexual male who alleged that

co-workers had, *inter alia*, placed explicit homosexual male playing cards, advertisements for

homosexual magazines, Gay Firefighter's Association envelopes, and used condoms inside his

desk.  The plaintiff had also allegedly received hate mail that accused him of working in a "pussy

job."  Id., at 733.  The court held that although the reference to the "pussy job" was "easily

understood as 'a job for a woman,' and implicate[d] plaintiff's masculinity," any link that the

plaintiff could draw between the harassment he had endured as a whole and his unmanliness was

"too attenuated to meet his burden on summary judgment."  Id., at 737.

      As in these cases, any link that Plaintiff can draw between the harassment he

endured as a whole and his unmanliness is too attenuated to raise a triable claim.  Plaintiff's

argument that "[s]tatements like faggot, fairy and queer were all attacks of a feminine quality

possessed by the male Plaintiff, and targeted as evil, by the defendants because of their distaste

of any female quality attendant to a male," (Compl., at ¶ 27), has been rejected by the caselaw.

See <u>Bianchi</u>, 183 F. Supp. 2d 726; <u>Spearman</u>, 231 F. 3d 1080; <u>Trigg</u>, 2001 WL 868336; <u>see</u> <u>also</u>

<u>Martin v. New York State Dep't of Correctional Servs.</u>, 224 F. Supp. 2d 434, 441, 447

(N.D.N.Y. 2002) (rejecting gender stereotyping claim where co-workers called plaintiff

"pervert," "faggot," "cock-sucker," "fudge-packer," and "gay bastard," because harassment was,

on its face, related to plaintiff's sexual orientation rather than any perceived lack of masculinity);

<u>Ianetta v. Putnam Investments, Inc.</u>, 183 F. Supp. 2d 415, 421 (D. Mass. 2002) (rejecting

homosexual male's claim that the term "faggot" was "necessarily a stereotypical term [that]

necessarily import[ed] the male gender").

16

Especially where, as here, Plaintiff previously attempted to recover for sexual orientation harassment under the same set of facts at the PCHR and has admitted on numerous occasions that he believed he was the target of harassment because of his homosexuality, the Court should view his gender stereotyping theory as disingenuous and reject it.

**B.    Plaintiff Was Not Subjected To Severe and Pervasive Harassment.**

Even if Plaintiff could produce any evidence of conduct based on gender stereotyping, rather than sexual orientation, he still cannot sustain a Title VII claim because he cannot demonstrate that he was the victim of severe and pervasive harassment.

**1.    Standard for Actionable Harassment.**

To state a Title VII claim based on hostile work environment, an employee must show that his work place was "permeated by discriminatory intimidation, ridicule and insult that [was] sufficiently severe and pervasive to alter the conditions of [his] employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Title VII is not "a general civility code," and it was not meant to "purge the workplace of vulgarity." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998); Oncale, 523 U.S. at 81; Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995). "The 'mere utterance of an . . . epithet which engenders offensive feelings in an employee' . . . does not sufficiently affect the conditions of employment to implicate Title VII." Weston v. Commonwealth of Pennsylvania, No. Civ. A. 98-3899, 2001 WL 1491132, at *3 (E.D. Pa. Nov. 20, 2001) (quoting Meritor Sav. Bank FSB v. Vinson, 477 U.S. 57, 67 (1986)). Moreover, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment" and are not actionable. Faragher, 524 U.S. at 788. "These standards for judging hostility are sufficiently

17

demanding . . . Properly applied, they will filter our complaints attacking the ordinary

tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes,

and occasional teasing." Id. (citation and quotation omitted).

        Against these standards, no rational trier of fact could conclude that Plaintiff was

subjected to severe and pervasive harassment.

     **2.**     **The Conduct Plaintiff Alleges Was Not Severe.**

        First, none of the conduct about which Plaintiff complains was severe.

        The mail and voicemails that Plaintiff alleges, which called him "gay," "fem,"

"faggot," and "queer," the co-worker mocking his limp wrist, and another co-worker calling him

"so gay," fall along the lines of the "utterance of [offensive] epithets," not the type of severe

behavior that would cause a reasonable person to find his workplace "hostile or abusive." See

Keown v. Richfood Holdings, No. Civ. A. 01-2156, 2002 WL 1340311, at *3 (E.D. Pa. June 19,

2002) (Schiller, J.) (quotation and citation omitted).

        This Court has consistently rejected analogous allegations of harassment as

insufficiently "severe" to meet the Title VII threshold.  For example, in Keown, 2002 WL

1340311, at *3-*4, this Court granted summary judgment for an employer where a male plaintiff

claimed that he had received eleven pamphlets at work that contained, *inter alia*, discussions of

male anatomy, graphs of penis size, and medical advice on erectile dysfunction.  The Court held

that although the pamphlets may have been "seedy and in bad taste," they did not place plaintiff

"into a sexually threatening or humiliating position" and were therefore not actionable. Id. See

also Gautney v. Amerigas Propane, Inc., 107 F. Supp. 2d 634, 643-45 (E.D. Pa. 2000) (granting

summary judgment for employer because plaintiff's allegations about co-worker lowering pants

to display tattoo on pelvic bone, commenting on size of sex organs and escapades with women,

showing plaintiff a story that included sexually explicit content, and visiting strip clubs on numerous occasions were insufficiently "severe" to state a Title VII claim).

As in these cases, Plaintiff has not alleged any "physically threatening or humiliating" conduct, any overt sexual propositioning, or any lewd or obscene gestures.  Harris, 510 U.S. at 23.  Nor is there any evidence that he "was subjected to extensive inquiries into [his] sex life or that comments were made about [his] physical sexual anatomy or that sexual material was displayed in the workplace." Gautney, 107 F. Supp. 2d at 643-45; see Bishop v. Nat'l R.R. Passenger Corp., 66 F. Supp. 2d 650, 663 (E.D. Pa. 1999) (holding that there was no hostile environment where plaintiff was not subjected to unwanted sexual advances, improper touching, insults, the appearance of sexual imagery or pornography, obscene language or gestures or any significant intrusions of a sexually hostile nature).

Pursuant to this authority, the Court should conclude that Plaintiff simply cannot establish the requisite level of severity to meet Title VII's standards.

### 3.    The Conduct Plaintiff Alleges Was Not Pervasive.

Nor can Plaintiff establish that he was subjected to pervasive harassment.

Plaintiff's allegations amount to only 4 pieces of "hate mail," 3-4 voicemails, and 3 instances of co-worker derogatory statements[9] that occurred over a 2 ½ year period.  There were large blocks of time during this 2 ½ year period where Plaintiff does not allege to have endured any harassment at all.  (See, e.g., Complaint, ¶¶ 10-11 (no harassment alleged between August 1997 and March 1998); ¶¶ 12-13 (no harassment alleged between July and December 1998); ¶¶ 13-20 (no harassment alleged between January and August 1999).)  The alleged

---

[9]    Plaintiff cannot recover for any harassing behavior that he did not report.  See Kunin, 175 F.3d at 294 (holding that an employer can only be held liable for co-worker harassment where it "knew or should have known about it and failed to take prompt remedial action").

incidents were also propagated by different employees from different departments whom Plaintiff does not allege to have had any communication with one other about him.  (See Kay Depo., at 55-56.)  Plaintiff cannot possibly establish any concerted or pervasive effort to alter his work environment.  See Keown, 2002 WL 1340311, at *5 (holding that eight or nine sexual pamphlets over a four month period were too infrequent to be pervasive); Bonora v. UGI Utilities, No. Civ. A. 99-5539, 2000 WL 1539077 (E.D. Pa. Oct. 18, 2000) (holding that conduct was not pervasive where plaintiff complained of ten incidents of harassment over two year period); Cooper-Nicholas v. City of Chester, No. Civ. A. 95-6493, 1997 WL 799443 (E.D. Pa. Dec. 30, 1997) (holding that eight sexual comments in a nineteen month period did not suffice to establish a hostile work environment); Johnson v. Souderton Area Sch. Dist., No. Civ. A. 95-7171, 1997 WL 164264 *6 (E.D. Pa. April 1, 1997) (holding that nine alleged incidents over a three year period were insufficient to demonstrate a hostile work environment).

Thus, when viewed as a whole, Plaintiff's allegations simply do not rise to the level of severe or pervasive conduct sufficient to state a Title VII claim.  The Court should grant summary judgment for IBC and dismiss Plaintiff's harassment claim.

**C.    Plaintiff Cannot Establish Respondeat Superior Liability.**

Finally, Plaintiff has no basis to impute liability on IBC for the co-worker harassment he alleges.

To meet his prima facie burden, Plaintiff must establish that IBC acted negligently by failing to take prompt remedial action upon receiving his harassment complaint. Kunin, 175 F.3d at 293-94.  "Essentially, the inquiry is whether the employer itself was negligent in failing to put a stop to an employee's harassing behavior."  Allen v. Nat'l R.R. Passenger Corp., 90 F. Supp. 2d 603, 610 (E.D. Pa. 2000), aff'd, 254 F.3d 1077 (3d Cir. 2001).

20

Plaintiff comes nowhere near meeting this burden. To the contrary, rather than suggesting negligence on the part of IBC, the undisputed evidence shows that IBC took immediate action upon receiving each of Plaintiff's harassment complaints and did everything in its power to remedy them. As an initial matter, IBC maintained and maintains a strict sexual harassment policy that is distributed to all employees. (Grossi-Tyson Decl., at ¶ 2.) Upon receiving Plaintiff's harassment complaint, moreover, IBC arranged for a meeting between Plaintiff, an HR Director, and the Company's in-house employment counsel. (Boswell Decl., at ¶ 2; see Kay Depo., at 52, 62, 66; Gilg Depo., at 72.) IBC also notified Plaintiff's supervisors about the situation and conducted interviews with the employees who worked in Plaintiff's area. (Boswell Decl., at ¶ 3; Gilg Depo., at 72.) Because these interviews did not reveal the source of the alleged harassment, IBC sent all employees who worked on Plaintiff's floor to Civil Treatment Training, including harassment training. (Boswell Decl., at ¶ 5; Gilg Depo., at 86-88; see Kay Depo., at 88.)

On the 3-4 occasions when Plaintiff complained of receiving harassing voicemails, IBC arranged to have Bell Atlantic place a wiretap on his phone. (Kay Depo., at 107-08, 112, 118-19.) Plaintiff cannot blame IBC for the fact that the traces were ineffective because the voicemails happened to "come in right after the trace[s] expired." (Id., at 107.) Nor does Plaintiff have any evidence to refute the sworn testimony of Gilg and Grossi-Tyson that IBC had attempted to place a permanent tap on his phone, but that it was impossible, from a technological standpoint, to do so. (See Grossi-Tyson Decl., at ¶ 4; Gilg Depo., at 106.)

Further, on the only two occasions when Plaintiff reported that a specific IBC employee had engaged in inappropriate conduct toward him (Foley and Bennett), IBC interviewed the individuals involved and verbally reprimanded the offending employees. (Foley Depo., at 26, 39; Bennett Depo., at 97; Gilg Depo., at 111-20, 130-31.) Although Plaintiff may

21

believe that IBC should have disciplined these individuals more severely, his admission that he never reported further harassment by either of them after the verbal reprimands demonstrates that IBC's remedial efforts were effective. (See Kay Depo., at 143, 154, 160-61.)

        Finally, in response to Plaintiff's complaint that IBC had not done enough to investigate the harassment he was allegedly enduring, in August 1999, IBC commissioned an outside, professional handwriting analysis to try to determine the source of the alleged "hate mail" and interviewed nine additional employees who worked in Plaintiff's area. (Grossi-Tyson Decl., at ¶¶ 3, 5.) Plaintiff cannot establish negligence on the part of IBC simply because IBC's investigation was unable to determine the source of the harassment. See Hirras v. Nat'l R.R. Passenger Corp., 95 F.3d 396 (5th Cir. 1996) (affirming summary judgment for employer in co-worker harassment case even though employer had been unsuccessful in determining the source of alleged harassment; court held that employer had -- as a matter of law -- taken prompt remedial action in response to employee's complaints where it interviewed other employees, placed a wiretap on plaintiff's telephone to try to determine the source of anonymous harassing phone calls, and attempted to determine the origin of an anonymous harassing note); McDonnell v. Cisneros, Nos. 94 C 4440, 94 C 7314, 1995 WL 110131, at *9 (N.D. Ill. Mar. 13, 1995) (holding that plaintiff had failed to establish employer negligence where employer had conducted an investigation in response to plaintiff's complaints about anonymous harassing letters but was unable to determine their source), aff'd in part and rev'd in part on other grounds, 84 F.3d 256 (7th Cir. 1996).

        Thus, based on the undisputed record evidence, Plaintiff cannot sustain a Title VII claim, and the Court should grant summary judgment for IBC.

## III.    PLAINTIFF CANNOT SUSTAIN A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

Plaintiff's final allegation against IBC, for intentional infliction of emotional distress, is likewise unavailing.  It is barred by the exclusivity provision of Pennsylvania's Workers' Compensation Act ("PWCA") and, even if not, does not meet the high standard of extreme and outrageous behavior necessary to state such a claim.

### A.    The PWCA Bars Plaintiff's Intentional Infliction of Emotional Distress Claim.

In Pennsylvania, the PWCA "is the exclusive means for obtaining compensation for injuries which has been substituted for common law tort actions between employees and employers."  Shick v. Shirey, 716 A.2d 1231, 1237 (Pa. 1998).[10/]  The scope of the exclusivity bar is broad, and even intentional torts, including those claims where the alleged facts can be fairly characterized as "appalling," are curtailed.  See Snyder v. Specialty Glass Prods., Inc., 658 A.2d 366 (Pa. Super. 1995); Poyser v. Newman & Co., 522 A.2d 548, 551 (Pa. Super. 1987).  The "legal immunity which is afforded to employers [by the PWCA] … extends not only to acts of negligence, but also to claims based on intentional, wanton and willful misconduct …" Shaffer v. Proctor & Gamble, 604 A.2d 289 (Pa. Super.) (quoting Alston v. St. Paul Ins. Co., 567 A.2d 663, 667 (Pa. Super. 1989)), appeal denied, 616 A.2d 986 (Pa. 1992).

Numerous Pennsylvania state and federal courts have specifically held that intentional infliction of emotional distress claims arising out of workplace conduct fall within the PWCA's exclusivity bar.  See, e.g., Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 940 (3d Cir. 1997) (holding that PWCA barred intentional infliction of emotional distress

---

[10/]    PWCA Section 481 provides:  "The liability of an employer under this act *shall be exclusive and in place of any and all other liability* to such employees . . .entitled to damages in any action at law or otherwise on account of any injury . . . 77 Pa. C.S.A. § 481(a) (emphasis added).

claim arising out of employment relationship); Steffeninin v. G.G.D., Jr., Inc., No. 94-5333,

1995 WL 230259, at *1 (E.D. Pa. Apr. 17, 1995) (same); Santiago v. Pennsylvania Nat'l Mut.

Casualty Ins. Co., 613 A.2d 1235 (Pa. Super. 1992) (same); Shaffer v. Proctor & Gamble, 604

A.2d at 291 (same).

Where, as here, Plaintiff's tort claim is based exclusively on conduct arising out

of his employment, that claim is barred as a matter of law and must be dismissed.

**B.    The Conduct Plaintiff Alleges Does Not Give Rise to
A Claim for Intentional Infliction of Emotional Distress.**

Even assuming, *arguendo*, that Plaintiff's tort claim is not preempted by the

PWCA, the actions about which Plaintiff complains simply do not rise to the level of extreme

and outrageous behavior required to state an intentional infliction of emotional distress claim.[11]

In Pennsylvania, only conduct that is "extreme or clearly outrageous" can support

a claim for intentional infliction of emotional distress. Hoy v. Angelone, 720 A.2d 745, 753-54

(Pa. 1998); see Heywood v. Cruzan Motors, Inc., 792 F.2d 367, 371-72 (3d Cir. 1986). The tort

is "reserved by the courts for only the most clearly desperate and ultra extreme conduct." Hoy,

720 A.2d at 754. This is an extremely high standard that rarely, if ever, met in the employment

context. Andrews v. City of Phila., 895 F.2d 1469, 1487 (3d Cir. 1990).

Here, the conduct about which Plaintiff complains comes nowhere near meeting

this stringent standard. In cases alleging analogous conduct, courts have consistently held the

"extreme and outrageous" element to be missing. See, e.g., Hoy, 720 A.2d at 754, 756

(dismissing claim by employee whose supervisor regularly called her "f---ing cunt," "f---ing

---

[11]    It is well established that it is for the Court, in the first instance, to determine whether alleged
conduct is sufficiently extreme and outrageous as to permit recovery for the tort. Reimer v. Tien,
514 A.2d 566, 569 (Pa. Super. 1986); Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir.
1988), cert. denied, 498 U.S. 811 (1990).

pussy," and "bitch," and who laughed at her when she complained about it); <u>Mensah v. Resources for Human Development</u>, No. 97-2517, 1997 WL 792901 (E.D. Pa. Dec. 23, 1997) (holding that offensive statements and retaliatory employment actions were insufficient as a matter of law to state a claim for intentional infliction of emotional distress); <u>Kotlinski v. Mortgage America, Inc.</u>, 40 F. Supp. 2d 298 (W.D. Pa. 1998) (granting summary judgment for employer where co-workers had commented that plaintiff was a lesbian; displayed pornographic Internet sites and pictures that exposed women's anatomy on workplace computers; made obscene jokes using her name; made references to her as "bullseye," alluding to anal intercourse; made references to her medical condition as resulting from too much sex; made inquiries concerning her underwear; and made references to sexual positions).

The Court should conclude that, as in these cases, the conduct about which Plaintiff complains simply does not rise to the level of extreme and outrageous behavior necessary to state an intentional infliction of emotional distress claim.

## CONCLUSION

For all of the foregoing reasons, the Court should enter summary judgment for IBC and dismiss the Complaint in its entirety.

Respectfully Submitted,

Steven R. Wall (#39012)
Amanda D. Haverstick (#85069)
Pam R. Jenoff (#87821)
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
215.963.4928/5377/5546

Attorneys for Defendant IBC

Dated:  April 1, 2003

25

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion for Summary Judgment has been served by hand delivery, this 1st day of April 2003, upon:

Jonathan J. James, Esq.
Arthur B. Jarrett, Esq.
James & Jarrett , P.C.
Stephen Girard Building, 9th Floor
21 South 12th Street
Philadelphia, PA 19107

Pam R. Jenoff