IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HARRY KAY, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| INDEPENDENCE BLUE CROSS, | : | No. 02-3157 |
|     Defendant. | : | |

<u>MEMORANDUM AND ORDER</u>

Schiller, J.                                                                                                                May     , 2003

      Plaintiff Harry Kay commenced this action on May 22, 2002, alleging that while he was employed by Defendant Independence Blue Cross ("IBC") he was subjected to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Presently before the Court is Defendant IBC's motion for summary judgment. Although I conclude that the conduct complained of constitutes gender stereotyping prohibited by Title VII, I nonetheless grant summary judgment in favor of IBC because Mr. Kay cannot show that the discrimination was pervasive and regular or establish the existence of respondeat superior liability.[1]

**I.     BACKGROUND**

      Plaintiff Harry Kay began his employment with IBC in June 1992 as an analyst in the Internal Systems Coordination Department.[2] (Kay Dep. at 23.) IBC maintains a written policy against sexual harassment that is distributed to all employees in a guidebook that also sets forth the

---

1. Plaintiff's Complaint includes a claim for intentional infliction of emotional distress. (Compl. ¶¶ 46-48.) Plaintiff agrees that this claim cannot survive summary judgment. (Def.'s Memo. of Law in Support of Summ. J. at 2.)

2. Defendant disputes some, if not many, of the facts discussed below. However, at this stage of the proceedings, the facts must be viewed in a light most favorable to Plaintiff, as the non-moving party, and are set forth accordingly herein.

appropriate individuals to whom harassment should be reported. (Grossi-Tyson Decl. ¶ 2; Def.'s Mot. for Summ. J., Ex. A.)  In August 1997, Mr. Kay became a Product Analyst in IBC's Product Analysis and Compliance Unit. (Kay Dep. at 23, 25-26.)  When Plaintiff began working as a Product Analyst, he moved from the ninth floor to the forty-second floor. (*Id*.)  Around this time, the alleged harassment began.

On his second day at his new position on the forty-second floor, while in the restroom, Mr. Kay overheard one co-worker ask another co-worker: "[D]id you see that fag that moved up on the floor yesterday?" (*Id*. at 52, 56.)  Shortly thereafter, Plaintiff saw a petition on the restroom wall stating: "If you want this queer off the floor, sign here." (*Id*. at 56.)  There were no further incidents until March 1998, when Mr. Kay received a letter accusing him of taking mail from a supervisor's mail box. (*Id*. at 26, 66-73; *id*., Ex. 3.)  That same month, an anonymous individual sent a letter to Plaintiff's supervisor alleging that Mr. Kay had been "staring, glaring and mumbling comments at the men who passed by his desk" (*Id*., Ex. 4), and Mr. Kay received a letter that stated: "Stop staring at me in the bathroom and on the floor, you faggot." (*Id*. at 59; *id.,* Ex. 2).

Mr. Kay brought this letter to the attention of Anthony Boswell, in-house counsel for IBC, and Human Resources Director Ronald Gilg. (*Id*. at 60-62.)  In response to Mr. Kay's concerns, Mr. Boswell and Mr. Gilg conducted an investigation that included interviewing Plaintiff, examining the document to try to determine its source, and interviewing various co-workers on the forty-second floor. (Boswell Decl. at ¶¶ 2,3; Gilg Dep. at 72.)  After this investigation proved unsuccessful, Mr. Boswell and Mr. Gilg required all non-managerial employees on the forty-second to undergo "civil treatment" training. (Boswell Decl. ¶ 5; Gilg Dep. at 86-87.)

On more than one occasion, Mr. Kay received harassing messages on his IBC voicemail account. Plaintiff received the first such message in May 1998, when an unidentified caller left a message containing heavy breathing. (Kay Dep. at 90, 103.) Mr. Kay testified at his deposition that words such as "faggot" and "fem" and the phrase "get off the floor" were used in some of these messages. (*Id.* at 105-06.) Plaintiff reported three or four of these voicemails to Human Resources. (*Id.* at 112.) On at least two occasions, Mr. Gilg directed the telephone company to place a trace on calls made to Plaintiff. (*Id.* at 107-08, 118-19.) When asked at his deposition whether he was satisfied with the wiretap placed at Mr. Gilg's direction, Plaintiff replied, "What else could he do?" (*Id.* at 96.)

In July 1998, Plaintiff received a photocopy of an advertisement for a telephone chat line, "1-800-FREE-GAY," in his mail at IBC. (*Id.* at 78, 86; *id.*, Ex. 5.) Typewritten above the advertisement was the following: "A real man in the corporate world would not come to work with an earring in his ear. But I guess you will never be a 'real man'!!!!!!" (*Id.,* Ex. 5.) Several months passed without incident, and, in December 1998, Plaintiff observed an IBC employee named Dennis Foley, who was walking behind him, bending his wrist and pointing at Plaintiff. (*Id.* at 137-141.) Mr. Gilg spoke to Mr. Foley about the incident (Foley Dep. at 26, 39), and Mr. Kay did not have any further problems with Mr. Foley (Kay Dep. at 143).

Another incident occurred in August 1999. When Plaintiff declined to replace the empty bottle atop an office water cooler, one of Mr. Kay's male co-worker was asked to perform the task. (*Id.* at 151.) As this was transpiring, an IBC employee, Donna Bennett, referring to the other employee, commented in the presence of Mr. Kay that she was "glad there was a real man on the floor." (*Id.* at 151-52.) Ms. Bennett later joked with other employees about the fact that Mr. Kay

had not replaced the water cooler bottle. (*Id*. at 154, 158.) At her deposition, Ms. Bennett, testified that she considered Plaintiff to be a "miss prissy." (Bennett Dep. at 94.) Mr. Gilg and John Brna, Ms. Bennett's supervisor, spoke with Ms. Bennett about the water cooler incident (Bennett Dep. at 99-108; Gilg Dep. at 130-31), and Plaintiff did not report any further incidents involving Ms. Bennett (Kay Dep. at 154, 160-61). In August 1999, Laura Grossi-Tyson, senior in-house counsel at IBC, had an outside, professional handwriting analysis performed on mailings that Mr. Kay reported that he had received. (Grossi-Tyson Decl. ¶ 3.) The results of the analysis did not enable IBC to determine the source of the mail. (*Id*.)

Citing stress caused by these incidents, Mr. Kay commenced short term disability leave from IBC in August 1999. (Kay Dep. at 315.) Mr. Kay returned to work in November 1999. (*Id*.) On February 17, 2000, Plaintiff received a harassing voicemail message and approached Manager Lila Tyson to complain about IBC's failure to put a stop to the phone calls. (Workers Compensation Hearing Tr. at 39.) Plaintiff alleges that in response to his complaint, Ms. Tyson raised an issue unrelated to his grievance and then suggested that Plaintiff again take time off from work. (*Id*. at 43.) After Mr. Kay returned to his desk, Plaintiff was met by Mr. Gilg, who escorted Plaintiff out of the building with orders that he take time off from work. (Kay Dep. at 137.) Plaintiff did not return to work at IBC. (Grossi-Tyson Decl. ¶ 7.) After filing complaints with the appropriate local, state, and federal authorities (Compl. ¶ 32), Plaintiff received a Right to Sue notice and timely commenced this action. (*Id*.)

## II.    SUMMARY JUDGMENT

Summary judgment is appropriate when the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The moving party bears the burden of showing that the record reveals no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson*, 477 U.S. at 247. Once the moving party has met its burden, the non-moving party must go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989).

## III.    DISCUSSION

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1)(2003). The

language of Title VII is broad, and, as the Supreme Court has held, "the phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women in employment.'" *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986) (*quoting Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978) (*quoting Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1198 (7th Cir. 1971))).

"It is well established that a plaintiff can demonstrate a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment." *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999) (*citing Meritor Sav. Bank*, 477 U.S. at 66 (1986)). A claim for hostile work environment consists of five elements: (1) intentional discrimination on the basis of gender; (2) pervasive and regular discrimination; (3) detrimental effect to the plaintiff; (4) detrimental effect to a reasonable person of the same race or gender in the same position; and (5) respondeat superior liability. *See Kunin,* 175 F.3d at 293 (*citing Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990)). I will address Defendant's arguments that Plaintiff cannot meet the first, second and fifth elements.

**A.   Gender Stereotyping**

    **1.   *Price Waterhouse* Precedent**

Title VII's prohibition of discrimination "because of . . . sex" protects both men and women. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 682 (1983). The Supreme Court has held that this prohibition applies to adverse treatment of an employee because his or her appearance or conduct is perceived as not conforming to gender stereotypes. *See Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989); *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 263 (3d Cir.

2001) (discussing gender stereotyping theory for proving same-sex sexual harassment based on *Price Waterhouse*).[3]

In *Price Waterhouse*, the Supreme Court reviewed the sex discrimination claim of a woman, Ann Hopkins, whose candidacy for partnership in an accounting firm had been placed on hold amidst comments that she was "macho," "overcompensated for being a woman," "and needed "a course at charm school." 490 U.S. at 235.  Furthermore, in the words of one of her so-called "supporters," Ms. Hopkins had "matured from a tough-talking somewhat masculine hard-nosed [manager] to an authoritative, formidable, but much more appealing lady candidate [for partnership]." *Id*.  As perhaps the most telling evidence of gender stereotyping, the partner who informed Ms. Hopkins of the reasons for the decision to place her candidacy on hold advised Ms. Hopkins to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.*

Emphasizing that "[w]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group," *id.* at 251, a plurality of the Court agreed that "in the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Id.* at 250.[4]  Furthermore, courts have held that the Supreme Court's reasoning is applicable to male employees abused because they are perceived as insufficiently masculine.

---

3. "'Gender' has often been used to distinguish socially- or culturally-based differences between men and women from biologically-based sex differences, but [the Third Circuit has] not considered 'sex' and 'gender' to be distinct concepts for Title VII purposes*." Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 148 (3d Cir. 1999).

4. Neither of the two concurring opinions in *Price Waterhouse* disagreed.  *See Bibby*, 260 F.3d at 264.

Relying on *Price Waterhouse*, the Seventh Circuit has found that "a man who is harassed because his voice is soft, his physique is slight, his hair is long, or because in some other respect he exhibits his masculinity in a way that does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of' his sex." *Doe v. City of Belleville*, 119 F.3d 563, 581 (7th Cir. 1997)[5]; *see also Nichols v. Azteca Rest. Enters.,* 256 F.3d 864, 874-75 (9th Cir. 2001) (holding that "the systematic abuse directed at [the plaintiff] reflected a belief that [he] did not act as a man should act" constituted actionable harassment under Title VII).

### 2. Gender Stereotyping Claims under *Bibby*

The Third Circuit addressed gender stereotyping and related issues in *Bibby v. Phila. Coca Cola Bottling Co.,* 260 F.3d 257 (3d Cir. 2001). Stating that "[h]arassment on the basis of sexual orientation has no place in our society," the Third Circuit nonetheless held that "[i]t is clear . . . that Title VII does not prohibit discrimination based on sexual orientation." *Id.* at 261, 265 (*citing Simonton v. Runyon*, 232 F.3d 33, 35 (2d Cir. 2000); *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 259 (1st Cir. 1999); *Williamson v. A.G. Edwards & Sons, Inc.,* 876 F.2d 69, 70 (8th Cir. 1989)). Moreover, the *Bibby* court explained that one way in which a plaintiff may demonstrate that harassment amounted to discrimination because of sex is by showing that the "harasser was acting to punish the victim's noncompliance with gender stereotypes." *Bibby*, 260 F.3d at 264. The

---

5. The Supreme Court vacated the judgment in *City of Belleville* and remanded the case for further consideration in light of *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998) (holding that Title VII provides a cause of action for same-sex sexual harassment). 523 U.S. 1001. "It would seem, however, that the gender stereotypes holding of *City of Belleville* was not disturbed. . . . Absent an explicit statement from the Supreme Court that it is turning its back on Price Waterhouse, there is no reason to believe that the remand in *City of Belleville* was intended to call its gender stereotypes holding into question. *City of Belleville* settled before there was a decision on remand." *Bibby*, 260 F.3d at 263 n.5.

Third Circuit went on to explain that the plaintiff, John Bibby, could not bring a claim for gender stereotyping:

> [H]e did not claim that he was harassed because he failed to comply with societal stereotypes of how men ought to appear or behave. . . .  His claim was, pure and simple, that he was discriminated against because of his sexual orientation. No reasonable finder of fact could reach the conclusion that he was discriminated against because he was a man.

*Id.*; *see also Simonton,* 232 F.3d at 36 (affirming summary judgment in favor of defendant when plaintiff "has alleged that he was discriminated against not because he was a man, but because of his sexual orientation").

Plaintiff's case stands in contrast to *Bibby*.  Beginning with the Complaint filed in this Court, Mr. Kay has never alleged sexual orientation discrimination, and, instead, has proceeded on the theory that the actions of his co-workers constituted "gender stereotyping." (Compl. ¶¶ 34, 35, 36.) Having properly alleged gender stereotyping as the basis for this action, Plaintiff is also able to cite ample evidence to support the stereotyping aspect of his claim.  As one example, in the July 1998 mailing, Plaintiff was told that he was not a "real man" because he came to work wearing an earring. As the mailing plainly indicated, Mr. Kay was targeted because his appearance was seen as less than stereotypically masculine.  *See City of Belleville*, 119 F.3d at 568-69 (finding harassment triggered by male plaintiff's decision to wear earring as amounting to actionable discrimination on basis of sex).  The comments about Mr. Kay's failure to change the water cooler bottle also reveal that Mr. Kay was subjected to gender stereotyping.  Again, Mr. Kay was mocked for not undertaking an activity that involves some physical strength, i.e., the mocking was aimed at Mr. Kay's masculinity, or perceived lack thereof.

Mr. Kay's case is also distinguishable from *Bianchi v. City of Philadelphia,* 183 F. Supp. 2d 726 (E.D. Pa. 2002), *appeal docketed*, No. 02-2687 (3d Cir. June 19, 2003). In *Bianchi*, "the only evidence that might directly link the harassment of Bianchi to a gender stereotype is the reference in the April 1998 letter to [plaintiff Robert] Bianchi's new position in the fire department as a 'pussy job.'" *Id.* at 737. Similarly, "Bianchi [did] not cite to any particular comments, actions, or other evidence in the record supporting his vague contention that the root of the harassment was that he acted (or was perceived to have acted) inappropriately for a male." *Id*. As discussed above, Mr. Kay has shown that he was subjected to adverse treatment because his co-workers perceptions that he was a "miss prissy" or less than "real man." As such, there is affirmative evidence that the harassment was related to perceptions about Mr. Kay's masculinity, rendering the conduct gender stereotyping actionable under Title VII.

### 3. Defendants' Arguments are Inconsistent With *Bibby*

IBC makes two arguments in support of its position that Mr. Kay cannot show that he was discriminated against "because of sex." Both arguments fail in light of *Bibby*.

First, IBC incorrectly argues that any stereotyping that occurred is not actionable because Mr. Kay was stereotyped as acting like a homosexual male and not because he was seen as acting like a woman. This argument frames the issue in a misleading fashion. As the Third Circuit has indicated, gender stereotyping claims may be brought by men when they have been harassed for failing "to comply with societal stereotypes of how men ought to appear or behave." *Bibby*, 260 F.3d at 264. Thus, Mr. Kay must show that he was discriminated against for not conforming with norms for the male gender, and he has done so. And, contrary to Defendant's assertions, having

shown that his co-workers subjected him to abuse because they found him in some way not to be stereotypically masculine, Plaintiff need not specifically show that he was viewed as womanly.

Second, highlighting the use of words such as "gay," "queer," and "faggot" in the derogatory remarks directed at Mr. Kay, Defendant argues that "there can be no doubt that Plaintiff's claim is essentially one for sexual orientation discrimination that is not covered by Title VII." (Def.'s Memo. of Law in Support of Summ. J. at 12.) This argument amounts to an attempt to rely on the evidence that harassment may have also been motivated by an anti-gay animus as a defense to the Title VII claim.

The *Bibby* court rejected this argument by holding that Plaintiffs in Title VII actions are not required to "prove that their harassers were not motivated by anti-gay animus." *Bibby*, 260 F.3d at 265. The Third Circuit further explained: "Once it has been shown that the harassment was motivated by the victim's sex, it is no defense that the harassment may have also been partially motivated by anti-gay or anti-lesbian animus." 260 F.3d at 265. As another court has put it, "[n]othing in Title VII suggests that Congress intended to confine the benefits of that statute to heterosexual employees alone." *Heller v. Columbia Edgewater Country Club*, 195 F. Supp. 2d 1212, 1222 (D. Or. 2002).

### B.   Pervasive and Regular Requirement

With respect to the second element of a hostile work environment claim, a plaintiff must establish that the harassment was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Harris v. Forklift Syst., Inc.*, 510 U.S. 17, 21 (1993). More specifically, the Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment. . . ." *Faragher v. City*

*of Boca Raton*, 524 U.S. 775, 778 (1998). The Third Circuit has defined "pervasive harassment" as "that which occurs regularly or when incidents are in concert with one another." *Andrews*, 895 F.2d at 1484.

As the Supreme Court has emphasized, courts should determine whether an environment is hostile or abusive "only by looking at all the circumstances.'" *Harris*, 510 U.S. at 23. Also stressing that the "totality of the circumstances" must be examined, *Andrews,* 895 F.2d at 1486, the Third Circuit has further explained that courts must look at numerous factors, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *See Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001) (*citing Harris*, 510 U.S. at 23).[6] In the Third Circuit, "it is settled law that courts should not consider each incident of harassment in isolation." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 155 (3d Cir. 1999) (*citing Andrews*, 895 F.2d at 1484). "Rather, a court must evaluate the sum total of abuse over time." *Id.* at 155.

First, in considering the severity of the discriminatory conduct and the nature of that conduct, it is apparent that at least some of the conduct at issue falls between acts that are physically threatening and humiliating and those that are offensive utterances. Although the petition posted in the bathroom and the anonymous voicemail messages involve a degree of intimidation, it is

---

6. In support of its argument that Mr. Kay was not subjected to pervasive and regular harassment, Defendant cite my decision in *Keown v. Richfood Holdings*, Civ. A. No. 01-2156, 2002 U.S. Dist. LEXIS 10835 (E.D. Pa. June 12, 2002). Because each hostile work environment must be assessed in light of the "totality of the circumstances," and because *Keown* involved a type of conduct different from that experienced by Mr. Kay, this citation neither helps nor hurts Defendant's argument.

significant that Plaintiff was never physically threatened or humiliated.  Viewed as a whole, the mistreatment directed at Plaintiff – while not trivial – involved conduct more accurately described as offensive utterances than something more egregious.

Second, and more importantly, the conduct at issue occurred relatively infrequently.  Plaintiffs' claim is based on four pieces of mail, three instances in which derogatory comments were made by co-workers, and anonymous voicemail messages, of which three or four were reported.  These incidents spanned a time period of approximately two and one half years, and from August 1997 to March 1998, and from January to August 1999, no harassment is even alleged.  (Compl. ¶¶ 10-12, 17-20.)  The infrequency of the discriminatory conduct strongly militates against Plaintiff.  *See Ogden v. Keystone Residence*, 226 F. Supp. 2d 588, 600 (M.D. 2002) (holding that without evidence indicating that harassment could be "characterized as constant or even frequent" no jury could reasonably find that such harassment was pervasive and regular); *Gharzouzi v. Northwestern Human Servs. of Pa.*, 225 F. Supp. 2d 514, 536 (E.D. Pa. 2002) (holding that six incidents over three month period insufficient to satisfy regular and pervasive requirement).  Similarly, the sporadic nature of the harassment, which included considerable periods without any reported instances, cuts against Plaintiff argument that the discriminatory conduct unreasonably interfered with his work performance.

Looking to all of the circumstances, Mr. Kay has not met his burden of coming forward with evidence from which a jury could conclude that his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of . . . his employment and create an abusive working environment."  *Harris*, 510 U.S. at 21.  Considering the nature of the conduct at issue, the fact that it did not occur in concert or with

regularity, and the total number of instances in question occurring over a span of more than two years, I conclude that a jury could not reasonably find that the harassment was pervasive and regular.

### C.    Respondeat Superior

IBC is also entitled to summary judgment because Mr. Kay cannot establish the existence of respondeat superior liability. "An employer is not always liable for a hostile work environment." *Kunin*, 175 F.3d at 293. In cases in which co-workers, as opposed to supervisors, are the harassers, "a plaintiff must demonstrate that the employer failed to provide a reasonable avenue for complaint, or, if the employer was aware of the alleged harassment, that it failed to take appropriate remedial action." *Weston,* 251 F.3d at 427 (citations omitted).[7] "Essentially, the inquiry is whether the employer itself was negligent in failing to put a stop to an employee's harassing behavior." *Allen v. Nat'l R.R. Passenger Corp.*, 90 F. Supp. 2d 603, 610 (E.D. Pa. 2000), *aff'd*, 254 F.3d 1077 (3d Cir. 2001). This standard "envisions prompt remedial action when the hostile environment is discovered." *Bouton v. BMW of N. America, Inc.*, 29 F.3d 103, 110 (3d Cir. 1994). "An effective grievance procedure – one that is known to the victim and that timely stops the harassment – shields the employer from Title VII liability for hostile environment." *Bouton*, 29 F.3d at 110.

---

7. In *Suders v. Easton*, 325 F.3d 432 (3d Cir. 2003), the Third Circuit recently held that a constructive discharge constitutes a tangible employment which, if proven, renders an employer strictly liable to a victimized employee for an actionable hostile work environment created by a supervisor. *Id*. at 435; *see also Faragher*, 524 U.S. at 803 (noting the "[r]ecognition of employer liability when discriminatory misuse of supervisory authority alters the terms and conditions of a victim's employment is underscored by the fact that the employer has a greater opportunity to guard against misconduct by supervisors than by common workers."); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998) ("[E]mployer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."). Any reliance on *Suders* by Plaintiff is misplaced because Plaintiff has not produced any evidence that his supervisors created the hostile work environment.

As evidenced by Mr. Kay's complaints, it is clear that IBC had a grievance procedure in place. Furthermore, it is undisputed that in response to Mr. Kay's complaints, IBC human resources department and counsel: (1) commissioned an outside, professional handwriting analysis in an attempt to determine the source of the mailings Plaintiff received; (2) arranged to have the telephone company place a wiretap on his telephone on more than one occasion; and (3) spoke to Mr. Foley and Ms. Bennett, such that Mr. Kay did not complain further about those individuals.

In arguing that IBC acted negligently, Plaintiff makes several arguments that, whether considered separately or taken together, are ultimately unpersuasive. First, Mr. Kay contends that IBC failed to adequately discipline Mr. Foley about walking with his wrist bent behind Mr. Kay or Ms. Bennett about the water cooler incident. This contention is grounded in deposition testimony from Ms. Bennett and Mr. Foley. In particular, Ms. Bennett testified that she was told to apologize to Mr. Kay but could not recall whether or not she did so. (Bennett Dep. at 107-07.) Mr. Foley testified as follows: "Maybe 'reprimand' is too strong a word. Maybe [Ronald Gilg and I] had a discussion . . . I wouldn't say he reprimanded me. . . ." (Foley Dep. at 38.) Whether characterized as a "reprimand" or a "discussion," and whether or not Ms. Bennett ever actually apologized, it is beyond dispute that IBC acted upon Mr. Kay's complaints about Mr. Foley and Ms. Bennett, and, because no further incidents involving either were reported, this action had the desired effect. Similarly, Plaintiff's argument that an investigation by Mr. Boswell was somehow inadequate (Pl.'s Adden. to Memo. of Law at 7), concedes that an investigation was conducted, and represents, at most, a minor objection to the manner in which it was conducted.[8]

---

8. Plaintiff also argues that the handwriting analysis and telephone wiretap may not have been performed properly. There is no evidence to support this argument, although Plaintiff does contend that the handwriting analysis was requested in discovery but not received. The relevant document request (Pl.'s Post Oral Argument Memo. of Law at 8), however, is too broad for this

15

Second, Mr. Kay asserts that the fact that IBC did not stop the voicemail messages is sufficient to trigger the employer's liability. While in some circumstances the failure to prevent harassment supports a plaintiff's hostile work environment claim, those circumstances are not present in Mr. Kay's case. Had IBC not taken prompt remedial measures in response to Mr. Kay's case, the failure to prevent subsequent harassment would be significant. *See Weston*, 251 F.3d at 427 (holding that failure to prevent assault by co-worker does not establish employer's liability when employer had effective grievance procedure). However, there is no evidence supporting any allegation that IBC did not act properly and promptly to address Plaintiff's concerns about the voicemail messages. Even Plaintiff has indicated that the steps IBC took with respect to the voicemail messages were satisfactory. Thus, without any evidence indicating that IBC was negligent, its failure to prevent the voicemail messages is not sufficient to create a triable issue. For similar reasons, Plaintiff's third contention, that IBC was negligent because it failed to keep adequate written documentation of Plaintiff's complaints, is misplaced. While IBC should have made a better record of Mr. Kay's complaints, its failure in this regard does not negate the prompt remedial actions taken by IBC.

Lastly, Plaintiff contends that he should have been moved from the forty-second floor as requested.[9] Any obligation on the part of IBC to move Mr. Kay to another floor would only arise if Mr. Kay was experiencing pervasive harassment. For the reasons discussed above, the conduct

---

argument to be tenable.

9. It appears that at some point there were discussions about moving Mr. Kay from the forty-second floor. (Kay Dep. at 325-36.) Nonetheless, in considering Defendant's motion, I will assume that IBC did not make a timely offer to move Plaintiff from the forty-second floor.

at issue did not rise to that level, and, therefore, IBC was not required to move Plaintiff from the forty-second floor.

For these reasons, Plaintiff's arguments do not show that IBC acted negligently. Moreover, in light of the steps taken by IBC in response to Mr. Kay's grievances, I conclude that no reasonable jury could find that Mr. Kay has established the existence of respondeat superior liability.

### IV. CONCLUSION

Accordingly, I conclude that the coworkers' acts at issue constitute gender stereotyping, and therefore, sex discrimination under Title VII. Because I also conclude that Mr. Kay cannot establish either the existence of pervasive and regular harassment or the existence of respondeat superior liability, I grant Defendant's motion for summary judgment. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HARRY KAY,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **INDEPENDENCE BLUE CROSS,** | : | **No. 02-3157** |
| **Defendant.** | : | |

## ORDER

**AND NOW**, this          day of **May, 2003**, upon consideration of Defendant Independence Blue Cross's Motion for Summary Judgment, Plaintiff Harry Kay's response thereto, Plaintiff's Addendum to its Memorandum of Law, and following oral argument, and for the foregoing reasons, it is hereby **ORDERED** that:

1. Defendant's Motion for Summary Judgment (Document No. 12) is **GRANTED**. Summary judgment is entered in favor Defendant Independence Blue Cross and against Plaintiff Harry Kay.

2. The Clerk of Court is directed to close this case for statistical purposes.

BY THE COURT:

_____
**Berle M. Schiller, J.**